Please call the first case. George E. Geyer v. Taugner Thank you. Please be seated. Will the counsel who will be presenting the argument this morning approach the bench? Give us your names. Good morning, Your Honor. I'm Keith A. Bison for the plaintiff, the appellant. The appellee. Patricia Noonan for the appellee, Daniel Chen, Dr. Daniel Chen. Thank you. Daniel Litchfield for appellees, Dr. Taugner, Dr. Kelly, and their dental practice. Jeffrey Taugner, DDS. Yes. Normally we allow 15 minutes to the appellants, 15 minutes to the appellee, with a brief 5 or 10-minute response by the appellant. Today, because of the nature of this case, so that we can get a full explanation of it and explication of it, we will be giving you 20 minutes for your presentations, and appellant will have 10 minutes to respond. So you may proceed. And for the record, counsel and I agreed to split the time equally. Now it makes sense. Okay. Morning again, Your Honors. This case, number one issue, we believe, is that the verdict in this case was contrary to the manifest weight of the evidence. And just briefly, Dr. Taugner had been Georgie Ann Geier's dentist for 20 years until May 15, 2006, and had never seen a lesion on her tongue at any time. Starting on May 15, 2006, there was a lesion noted on the left lateral border of her tongue that was present every time she saw one of the defendants thereafter. And it became progressively larger, more painful, and noted eventually to be ominous when it was already too late to do anything about it. This lesion was in the same place on May 15, which is the first time Dr. Taugner saw it, and on August 30, which is the second time he saw it. That's by his own testimony. And according to his own expert, Dr. Hurst, it was worse on August 30. It had been there more than two weeks. Everybody agreed that the standard of care required biopsy in a lesion that's present more than two weeks. It was not biopsy. Dr. Taugner's own expert, Dr. Hurst, also agreed that this lesion was persistent and that Dr. Taugner should have had cancer in his differential diagnosis, which he never did, even up until the last time he saw her over a year later in August, when this was so obvious, according to Dr. Chin's expert, that he called it right under your nose. On August 30, there's a referral to Dr. Chin by Dr. Taugner specifically for the problem on the tongue. There's nothing on the cheek. And two weeks later, Dr. Chin sees her with no documentation in his records at that time as to what he saw, and he biopsies her cheek instead of her tongue with the reasoning, given at trial, that this was a continuous lesion and you could biopsy any part of it and get the information you needed. Dr. Chin's own expert, Dr. Ghali, disagreed with that, said it didn't make any sense, and he referred to this, you would have to jump over the teeth in order to be the same lesion. He also agreed that if you have two different lesions that look different in two different places, you need to biopsy both. Tongue is not biopsy. Dr. Ghali, Dr. Chin's own expert, questioned the credibility of all three of these defendants in what they came in to say in court based on comparison of what was in their records, or I should say what was not in their records in terms of the location of this lesion. And so we now get to December 14. Dr. Kelly, Dr. Taugner's wife, who also was a dentist working in the office, is aware from the records that this lesion was present on August, I'm sorry, May 15 and August 30, and it's still present now in December. She doesn't talk to either of the other doctors. She decides to just send the patient out and rely on the patient to make a self-diagnosis. It was in the same location on that date. Dr. Chin himself testified, and he saw Georgi Ann Geier three times. He saw her on September 15, 06, April 30 of 07, and August 27 of 07, and he said that this lesion was in the same place at all three of those visits. That's the same person examining the same patient. The lesion had been changing. And when the white spot came up, was that the main indicator? No, actually, Justice, with all respect, this lesion was in the same place, and until you do a biopsy, you can't tell what it is. The white spot, if you're referring to when my client finally, it was so big and so obvious that she could see it as a layperson, didn't occur until July of 07. But the dentists were doing an exam with instruments and things that the patient can't see where this was smaller. It started out small, and it was described sometimes as white, sometimes as red, and the evidence in the case was changing color in and of itself is even more concerning than if it stayed the same color. Because we had started out as, I believe, a red, white, or whatever, but it changed color. Again, this is a persistent lesion. Every time these defendants saw her after starting on August 30, 2006, it had been present for more than two weeks, and it wasn't biopsy. There wasn't even a biopsy suggested until Dr. Chin finally does it in August of 2007 when everybody agreed it was too late to get a better outcome, and at the time when Dr. Taubner still didn't have cancer in his differential diagnosis, even though his own experts said he should have. These defendants were completely indifferent to this situation. Dr. Taubner is concerned about the tongue. He refers her to an oral surgeon, presumably to have an evaluation and potentially a biopsy of the tongue, and then he finds out the cheek has been biopsied and just says, okay, never mind. Chin, the referral was for the tongue. The evidence said the referral was for the tongue. He biopsies the cheek and never deals with the tongue, even though his own expert disagreed with his thinking about why he didn't biopsy it. And then Dr. Kelly, third time in the office, in the chart, this is a persistent lesion in the same spot, still doesn't do a biopsy. And the evidence was clear. We believe that a biopsy, the earlier the better, obviously, but a biopsy back in 2006 into early 2007 would have prevented this horrible mutilating surgery that she needed to have with the radiation that was a life-altering event for her. Mr. Habeisen. Yes. Because of the press of time, we've all gone over this record extensively. Personally, the more intriguing argument deals with the non-defendant Washington actors. I don't want to take you away from your prepared argument, but I think you need to focus on that. Okay. Thank you. And actually, that was my next point. Let's get into that and why you think that that was improper. Perfect. So here's the context for this. These were videotaped evidence depositions that were taken before trial, and these were treaters who had also given discovery depositions. And the gist of our motion in Lemonade No. 41 to bar the key aspects of that, which is what they saw, what they thought should be done, those types of things, was threefold. One is that some of these apply to some, some apply to all, you know, whatever, but they fit where they fit. We made the arguments in the brief. Some of these people had no duty to look. Like for, you know, the GI guy who's doing a colonoscopy, why would he look in her mouth? Okay. That's an example of that. There were others that weren't qualified to look. In fact, except for Dr. Gittleman, arguably, none of these people were trained properly to be doing the same thing, and only Dr. Gittleman even had a license that would apply to the conduct and the skill set of any of the defendants. All the rest of them were medical. Go ahead. I'm sorry. The judge had had you do these videotapes before they were shown to the jury. He had, the motion in Lemonade that I'm holding my hands up for the court. He did not review the videotapes, but he had the transcripts were attached in their entirety to the motion. And so that's the answer to your question. The problem with this whole thing with the treaters is, as I mentioned earlier in my comments so far, is that the defendants agreed every time she was in to see them, they saw this lesion. Now, there was all kinds of debate about, you know, what it looked like and all this other thing or what they should or shouldn't have done about it. But with that set of evidence, if some other treater who doesn't have a duty is not qualified to look or doesn't even look, if there's an absence of a report to that doctor or an absence of a documentation of that, that had nothing to do with this case. These other facts supersede that. And so the problem was you've got not technically standard of care testimony coming from these treaters in Washington, but the jury would get the same kind of information out of this. What did you see? What did you think it was? Which, by the way, is not a fact. That's a medical diagnosis. And whether it needed to be biopsied or not is a medical opinion that, you know, if it isn't standard of care, it certainly suggests the same thing to a jury. And so all of that information, we asked the judge ahead of time to look at this. This should not come in. We had an extensive motion. The other thing I want to mention is the defendants were not aware of any of this information about these other treaters during the time they were taking care of this patient. So they couldn't have relied on that. It wasn't relevant to what they decided to do. So the trial judge made it clear in his ruling that he was going to allow this in for the purpose of letting these witnesses testify to what they saw and whether it needed to be biopsied. And I submit those are not facts. Those are medical opinions. And you now have medical doctors who are not dentists and oral surgeons getting engaged in a discussion about something where they had no business doing it for a variety of reasons. In fact, Dr. Chin admitted on page 40 of his brief that they did give opinions. These are not just fact witnesses. And so we submit that as far as those treaters were concerned, even if there was any slight probative value that you could get out of that, the danger of unfair prejudice clearly, clearly outweighed that minimal, if any, probative value. Well, in terms of that, though, you wound up by having these physicians from Washington, you had this mechanism that made it a case involving nine practitioners instead of three. Well, correct. And actually the defendants end up arguing in closing arguments that in order for us to win, we would have to show that not only were the defendants wrong, but all those other treaters were wrong. I mean, that's a standard of care argument is that they're basically saying we have nine other people that are supporting us, that there wasn't anything that needed to be done about this. And these are people that are not qualified to give that testimony in a case involving a dentist and an oral surgeon. Was that objected to? It was part of our motion to eliminate. Well, what about the argument? Oh, the argument? You know, I honestly believe that I did not object to that from my memory. Well, much of the debate was over whether it was thrush or that it was lichen. Exactly. But that is the whole point about a biopsy is you can't make that, you cannot rule out cancer and say it's lichen planus or thrush without doing a biopsy. That's why Dr. Chin did the biopsy of the cheek to begin with. He did the wrong thing, but he biopsied. That was what it was to rule out cancer. But there's also some discussion about it mimicking it. In other words, that it would present the same way. You'd have the whiteness that you would see on the side of the tongue that ultimately developed. Correct. And with all respect, I have the same answer. That's why the standard of care requires a biopsy. If it's persistent for two weeks or longer. Everybody agreed with this, by the way. If it's persistent for two weeks or longer, you can't tell what it is and you can't rule out cancer without doing a biopsy. And it's great, you can think about thrush and you can think about lichen planus, but this is a classic example of why the biopsy has to be done and you can't go by just looking at it. Address briefly, if you would, Ms. Geyer's, the discussions in the briefs about Ms. Geyer's participation and whether or not she was somehow involved in exacerbating this situation. Sure. Well, first of all, that was the next point I was going to raise, assuming I had time. And that's the defendants essentially violated the rulings on the motion to eliminate on her conduct. There was a motion to eliminate and exclude anything about comparative fault, contributory fault, failure to mitigate damages. And there were many times, including starting in voir dire, where they were asking potential jurors, do you think a patient has a duty to follow the instructions of a doctor? Well, that was ruled out of the case. I objected to that.  And then they sprinkled that throughout the case. And they were suggesting that somehow she was supposed to self-diagnose this. She was supposed to do their job for them and tell them what's going on with her mouth, when every time she comes in, the lesion is there. There's no secret here. This lesion is theirs. They didn't need her to tell them anything. They just needed her to tell her she needed a biopsy, which she agreed to of the wrong body part back in September of 06, and she would have been biopsied. Am I reading the record correctly that Dr. Chin originally filed an affirmative defense of contributory negligence? There was a pending, I believe it was Dr. Chin, there was certainly a pending affirmative defense of contributory negligence at the time we started trial, and then based on the motion to eliminate, the judge had it added, granted our motion, and said it's out of the case. There was no causation testimony on it. It was the basis for that ruling. Right. So that was not at issue in the trial? It wasn't supposed to be. Counsel, isn't there – I'm sorry. I'm sorry. Right. It was ruled by the judge that was not supposed to be in the trial. Okay. And that was in ruling on either eliminating 3940 or 41? I believe 40 was the contributory. It's those three. You're right. It's either 39 or 40 since it's not 41. 41 I remember better. Okay. Thank you. Thank you. Justice Liu, did you have a question? No, I was looking for which number the motion was. Okay. And then the final thing is, and I think I put these in my view of their relative importance, although they're all important, is the third feature of the smoke and mirrors that were going on in this trial that distracted the jury from what the clear evidence showed is that the pointing the finger at the plaintiff about other various medical conditions she had that weren't related to anything at all, and basically this was all designed to make the jury believe she was unworthy of a verdict in her favor. So we submit that if you look at the uncontested evidence in this case as to the presence of this lesion that persisted for more than two weeks, the uncontested evidence that the standard of care requires a persistent lesion in the oral cavity, in this case the tongue, to be biopsied if it's present for two weeks or longer, there's no question that the standard of care was violated, and there's also sufficient evidence to establish that if the standard of care had been followed going all the way back, certainly to September 15, 06, we wouldn't be here because she would have had a simple excision of a very small lesion that would have prevented this outcome. Counsel, on the motion to eliminate number 41, that's the one with respect to non-defendant doctors, why would you argue that those, your objections aren't waived on this? Okay. Well, I have a couple, a very good question, and I obviously anticipated that because it was raised by defendants, you know, in the post-trial motion. First of all, this is different than all the other case law that you see out there about the need for a contemporary objection after a motion to eliminate is denied. And the reason for that, and it comes up in the Spurka case, which was a videotaped animation, is that it's fixed at that point. We know exactly what it is. There's not going to be any live events that can happen during trial that would prompt a judge to change his ruling. And so it had been clearly ruled on by the court that he was going to allow this in, and then what follows after, and here, the other thing Judge Haddad mentioned in the hearing on the post-trial motion is that, first of all, he addressed the issue, so I don't believe he thought it was waived. This came up, it was a prominent part of the argument, and he actually mentioned his reasoning for why he allowed it in, and he reiterated that. He thought it was relevant to show the things that he allowed it in for. He agreed with me that, contrary to the suggestion by one of the trial counsel, I mean the counsel in the argument, that I should have objected during the plaintiffs' start, stop, start, this video, every time I had an objection to it and get it ruled on again. He clearly agreed that doesn't make any sense, and that's not something that he would have expected. And so I don't believe Judge Haddad, who denied the post-trial motion, believed this was waived at all. He seriously considered this, and we respectfully don't agree with his ruling on that. But what would be the purpose to object to this? Where are we going with that? This was one of the most comprehensive motions in lemonade I've ever filed. It was very detailed. It was specific. It was directed and targeted at certain things. We had arguments on it. Everybody knew what the issues were, and the judge made a ruling on it. These videos were already done, and we respectfully suggest that there is a huge distinction between, I don't know if I can pronounce it, I'm not good with Latin, viva voce testimony, which is live testimony, and something that's in the can. And Sperka said the same thing about an animation. I say that it makes sense for that to be the law for a videotape evidence deposition. And there is no case that says with a videotape evidence deposition you have to object after it's been ruled on. In fact, why would you have rulings on evidence depositions ahead of time if you're going to have to object again anyway? I mean, that's how the trial practice is. These are edited and fixed out so they can be played to the jury without interruptions. So that's most of my answer to that. The last answer I would give to that is that Judge Haddad himself mentioned in the hearing on the post-trial motion that he recognized the distinction between how objections should be made in connection with live testimony, viva voce, versus videotape. And that's at the report of proceedings 2850. And it's report of proceedings 2871 where he's agreed I didn't have to object during the videos. So I think the waiver issue comes up first with the trial judge before it's before your honors. And I believe the record is clear that Judge Haddad did not believe that there was a waiver of that issue. And he made it clear that an objection, if it had been made at some other point during the trial, would have resulted in the same ruling. So there's no basis to believe that the failure to object, again, would have had anything to do with the outcome. So, again, with all due respect to Judge Haddad and that situation, we firmly believe that we did not waive and we have not forfeited that issue based on the unique circumstances of this case with what we're dealing with. Is that the reason why you brought it up in your opening statement, knowing that you had to basically front the issue because it was coming in in any event? I don't recall what, if you can refresh my memory, what I brought up. Well, I think you mentioned that there is going to be evidence of the Washington document. Right. Well, he said it was going to be played. They're in the can. So now I have to try the case with the rulings the judge has made. I can't just sit down and not try the case anymore. I mean, that's how trials work. And so, yeah, I knew it was coming in. I figured I'd say something about it and whatever I wanted to say about it, knowing what the defendants might do with it. I had my argument with the court. The court disagreed with me. I respect the judge, and I'm not going to go back and re-argue it again. We did it in a way that was orderly, and they're in the can and ready to go. So I did have to try the case, knowing what the rulings were, and make some decisions about how I wanted to deal with that, having lost what I thought was a very, very, very key ruling. Thank you. Thank you. I think my time is up, isn't it? The light hasn't gone on. Are there any other questions? Because I didn't really have anything else to add at this point. I'll save it for a response. You'll have another response. Okay. Thank you, Your Honors. Thank you. Ms. Norton? Yes, go ahead. Mr. Litchfield. Good morning. Again, Daniel Litchfield representing defendants Togner and Kelly and their dental practice. It's well established that the law gives two layers of deference to the verdict and the judgment here. The first layer of deference is built into the manifest weight of the evidence standard that was applied by the trial court in denying the motion for a new trial. The second level of deference is in the standard for the review of the trial court's decision in that regard, and that's an abuse of discretion standard. Both need to be given great weight in viewing the appeal here. The trial court, in particular, had the benefit of being there to observe the jurors and to observe the evidence that the jurors observed. That's part of the reason we believe why the abuse of discretion standard is the one that's applied to the trial court's decision here. The trial court saw the things that are entrusted in this state and in this country to the scope of what the juror is supposed to do. Credibility, evaluation of the weight of the evidence, evaluation of inferences from the evidence. That was done here by the jury, that was observed by the court, and the court, with the benefit of those observations, denied the motion for a new trial. And on an abuse of discretion standard, there should be no basis to unsettle that decision. It's very important to look at the types of contested issues that this jury was faced with. It was, to me, classic stuff. Jurors have to sort out differing views of the evidence, conflicting evidence, expert testimony. A great example is the issue that's already been discussed this morning. The plaintiff's theory of the case was there was one lesion in one exact place that was there in May of 2006 and persisted and grew and became the cancer that she was afflicted with and that was discovered in the fall of 2007. The defendants, however, presented evidence of a very different scenario. That evidence that was presented by the parties themselves, Dr. Togner and Dr. Kelly, as well as by their experts, that evidence was that there were different things going on at different times. They were explained by the diagnoses that were made at those different times, the prophyget and the red spot in May, the white spot that was seen later in August in a different place, what was seen the next December by Dr. Kelly in yet a different place. It was my clients who testified about particular tooth numbers that were associated with where they made these observations. Now, you'll notice that the plaintiff's approach to the case is to assume that this was one thing in one spot that was unchanging through the entire time. And then the arguments launch off that assumption. But it was the jury that had to determine whether that assumption was accurate and whether it was based on the evidence in a situation where there was conflicting evidence and where there was conflicting expert testimony. That takes us to the issue that the court pointed counsel to a moment ago, the treating physicians from Washington, D.C. The court reserved ruling on this issue in response to the motion in limine. I think counsel said that none of these people had a duty to look. But the issue wasn't whether they had a duty to look. The issue was what did they see? What did they hear? Well, but you would agree that physicians typically, unless they're looking for something, don't look for something. But the issue was different. Every doctor that I've ever encountered in my life is very reluctant, in fact, refuses to get into areas that is not within their expertise. So if you go to an allergist who's treating you for an allergy, like they were treating plaintiff in this case, they're not going to volunteer or admit that they were looking for anything other than something related to an allergy. So if they have an allergist testify that he did not see a lesion or problems with her mouth or that the plaintiff did not complain of a sore in her mouth, why would she and why would he be concerned with that? Because the jury here was told that this wasn't about the standard of care. It was about what happened and when it happened. And then the allergist testifies to what the allergist saw or did not see, to what the plaintiff said or did not say. Did she complain? Did she not complain about something? And then it's for the jury to weigh that evidence. But if the allergist is not typically looking for a sore on the tongue, why would that be relevant to this jury or why would a judge allow that testimony to come in to create the atmosphere or attitude that here's a professional and he didn't see anything, therefore it must not have been there, even though he didn't render an opinion of that. He is a medical doctor. And allergists typically don't get into that. Again, Judge, it goes to the weight of the evidence. The jury heard the testimony and they heard the other side's arguments essentially to the effect of what Your Honor is saying right now. It's for the jury to sort that out. But the question is, should that have been allowed in the first instance? Absolutely. Well, I know you believe it should have because you were allowed to do it. And you would agree that it was an important element of your defense that these Washington doctors didn't support the notion that there was a sore in her mouth and that it was this problem that led to the discovery of cancer? I would agree that it was relevant and it was properly admitted as to how important it was to us, is what the jury is there to sort out, along with other evidence. Is it more or less important than what Dr. Togner said he saw in her mouth when he made the examination? Well, you obviously thought it was because if you didn't think it was important, you wouldn't have. It was relevant. I'm sorry, Your Honor, I didn't mean to interrupt. My apologies. No, that's okay. It was relevant to what was going on in her mouth during an important and relevant time period when my clients weren't seeing her. We go from December of 06 into that spring of 07 time period. She's not being physically seen by my clients during that period of time. We understand that. And so it's important to know what is going on during that time period. Mr. Richcliffe? Yes. I'm sorry. I understand what you're saying. I don't mean to cut you off, but I want to distinguish. When you're talking about the intervening period and the plaintiff is seeing various physicians, gastroenterologists, allergists, internists, is it your proposition that a patient going in for a checkup or a visit with specialists would actually have an occasion either on the pre-physical form where you check off all of the symptoms or when describing chief complaints during triage to specifically mention an area that isn't within that particular specialty? My experience is yes. And I think the evidence here would bear it out if one were to drill down to whatever documentary evidence or testimony might have borne on that. Certainly I think a patient is entitled to believe that if somebody looks in their mouth and sees something, that they don't keep silent because it's not in their area of specialty or because it was not something that was put on a pre-admission form or an information form. I think the patient wants to be told that they saw something. Would your opinion be different if it was an orthopedic surgeon looking at a fracture somewhere in one of her limbs? Would that be different? I think that goes to the weight of the evidence. But no, I don't think it's different on the issue of relevance and admissibility with proper guidance as there was here from the court as to what the purpose of the evidence is. Nobody was telling them that the evidence was to say that these people made a mistake. The evidence was these are the only people that observed what was going in their mouth other than she herself. And her testimony was there for this time period. And from our perspective, they're fact witnesses who see things or don't see things,  they're entirely appropriate for them to testify about what they saw or didn't see irrespective of their specialty. But even if you are just submitting them for the purpose of showing what her condition was or what was objectively observed, isn't there still an underlying implication that if it's not listed in the chief complaint, if it's not listed as a subjective complaint or a report by the patient, that she's somehow responsible for not asking to have that checked? No. Again, it goes to the weight of the evidence. That might also be indicative that she didn't have a complaint about that at the time and that would be relevant and pertinent evidence as well. And it was argued to that effect here. I mean, there was a point and counterpoint on this. Again, not things about which there were assumptions of truth and that it was all one way. This was all hotly contested. And that sentiment was presented. Your comment about the jury being confused, throughout the briefs, we see this flow back and forth of various theories of what's occurred here. Thrush or the lichen, that that was what was the problem with this woman. Then you had some doctors who noted on the file that it possibly could be malignant, but not many. I think three did. And so the flag was raised, but people kept going on with other ideas as to what was going on here, including these two other overlays that when they looked in the mouth they could see. When they kept pushing towards this, it got to a point where Dr. Chin was urged to do a biopsy. And he didn't, and he didn't, and he didn't until the third time, at which time he did it at the cheek instead of doing it on the tongue itself. And so therefore, and there's actually, there's a part in the record where they said, well, we think it was lichensplenum all the time and not malignant whatsoever. So there were all these different opinions being bandied about while nobody was really, frankly, looking exactly at where the cause was. And the cause was in the tongue, and it was, according to the record as I see it, it was noted as possibly malignant when that white spot showed up, that that was a defining moment. And even at that time, nothing occurred. Now then you overlay that with having doctors from Washington, D.C., and you've got the way this unfolded and the way the court handled it. You had three defendants, and then when you had the six doctors weighing from D.C., the statement was, do I have it here? It was basically that it was really nine people who had to make the determination in this case. That's how it was described. And the court said, defendants argued that the deposition testimony, this was in the briefs, it's been part of our defense that there was no cancer. The trial court asked defendants in return, and you're claiming that these other doctors who looked at her at the time had an opportunity to see the very same thing the defendants did, and failed to denote that as evidence of a cancerous lesion? Defendants counsel responded or didn't see anything or saw something that the defendant diagnosed which would be lichen planus or thrush. The court responded, and they're permitted to do that. They wouldn't be here if this wasn't their defense.  And then the trial court denied the motion in part and permitted that the non-defendant doctor's testimony to support their theory that the plaintiff did not have cancer. It didn't permit the defendants to use the doctor's testimony to infer or argue that the non-defendant doctors were negligent in their treatment of the plaintiff. In other words, it became biased towards these doctors who really didn't have the credentials. They were internists, and they weren't oral surgeons. And so now you've got a jury struggling with this, and particularly after what the court has said to them, they're now dealing with nine jurors instead of just three. They've got nine parties involved in this rather than three by adding the other six from Washington. How are the jurors supposed to translate this out after getting instruction like that from the court and allowing it in in the first place? Well, Judge, first of all, the court was correct to allow it in in the first place for the reasons that I've articulated. It was factual testimony about what was going on in the plaintiff's mouth. Secondly, with regard to the issue of juror confusion, I've seen no evidence, and I'm not even sure I've seen an argument, that these jurors were confused by this. I think the arguments have been of a different tenor. Certainly have seen no evidence or indication of confusion. Moreover, there's been, at least to date that I have seen, there's been no attack on the various instructions, jury instructions, that were involved with regard to this sequence. So I'm not sure why that wouldn't be waived at this point. With regard to the arguments that have been raised, the arguments that this was irrelevant evidence or should have been balanced in such a way as not to be presented, we've responded to those arguments in our briefs, and in essence, I think what the court is getting at is what we would see as the classic example of something that goes to the weight of the evidence for the properly instructed jury to sort out. We've seen no case law that would suggest that somebody who sees something is disqualified to testify to what they saw because of their profession or because of their specialty. And I don't see why that would be carried over into this realm. Because again, these were not presented as experts who were going to testify about the standard of care. These folks were asked, what did you see or what did you not see, such as it was, and then the plaintiff had full reign to take the plaintiff's shots at what their testimony was, which is what jurors sort out. Who were you talking about when you just said they? Plaintiff. The plaintiff. But you argued to the jury that the plaintiff has to discredit all of these doctors, all nine of them, three defendants and the six from Washington. It's an incredible thing they have to do. They have to take nine doctors and say they all missed it. That's what you argued to the jury. Now, to me, it's somewhat of a fool's errand to expect a jury, on the one hand, to be admonished as to a limiting instruction on how to treat the evidence, when that limiting instruction didn't dissuade counsel from arguing to the contrary. I used to love listening to the radio, the Paul Harvey, the rest of the story. The rest of this story is that that comment was made in direct response to something stated in closing argument by plaintiff, and we quoted it and pointed it out and cited to it in our brief. That's a very different kettle of fish. When we get to that point and the plaintiff has said something in closing, we at that point don't have our hands tied behind our back such that we can't respond to what he has said. And that's what that was about. And in context, that's clear if one goes back and reads through the argument from before, through that passage, and on, and then separately looks at the plaintiff's argument and the portion of the plaintiff's argument being responded to. But you do have to take it in the context of the fact that the evidence was allowed into evidence in the first instance, so that the whole trial is basically the plaintiff contending that what the defendant's client confronted with at the time of their treatment was such that the standard of care required them to do something and they failed to do it. Classic plaintiff's negligence claim. And the defendant's being allowed to say what we did was within the standard of care, and it was within the standard of care because look to what non-defendant doctors did or didn't do based upon what they saw or didn't see in areas of medical specialty that weren't at issue and didn't relate to the standard of care in a case where the verdict could only be given based upon expert testimony guiding the jury in how to treat it. So you're asking lay people to deal with matters of great complexity where it requires expert testimony to also sit there and listen to evidence that is presented to them by, in their mind, professional experts who aren't rendering and sometimes were rendering expert opinion. Classic confusion argument. Again, Judge, no evidence that we have seen nor argument of such confusion. Moreover, let me get back and get clear on one thing, just so our perspective is crystal clear. The quote that was just stated and the argument that was made was not in a context of standard of care. It was not presented as a standard of care matter. It was factual as to what happened and when, and then a response to a comment and closing argument by opposing counsel who opened that door. Now to the experts in the case. The experts addressed these other witnesses. They addressed a wide range of issues about them. An example would be the CT scan, which was done in the spring of 2007. The CT scan, according to our expert, could have but did not show any cancer. Spring of 07. Important evidence for the defense. Now, I will grant you, if one steps up out of my role as an advocate and looks at all the evidence, there was another side presented by the plaintiff about that CT scan, notwithstanding the fact that it was the CT scan later on in the year that actually discovered the cancer. The point being, this is what juries are for. They need to sort out the weight of the evidence, the credibility of the witnesses. The case law is very clear from Maple and York and otherwise from the Supreme Court. That it's the juror that has to figure out what the expert is saying and sort out what the expert is telling them. Where there's credibility issues about the expert, they have to resolve it. Where there's issues about the weight of the evidence, coming from the expert, they have to resolve it. That's done time after time after time across the street. It's something that I'm familiar with from my own practice. And the important point is this case is no different. This was a jury sorting out differences in the evidence, as jurors always do. They were asked to review the entire trial, gave them a proper basis to reach their decision, and then when he was faced with the new trial motion, which was a substantial motion with substantial material, case law cited and etc., he used his point of view as having been present at the trial throughout in order to gauge whether a new trial was appropriate. And I think the judge took it very seriously, poured over all of this, and reached his decision for the right reasons, and thus that should be affirmed. I don't know where I am on time or if there are more questions. I don't want to be unwelcome, but I want to answer every question you've got. The CT scan and the visual changes to the tongue, the only acid test that finally put the question and answered it came through Dr. Klein from D.C., who said that he didn't see any change in the ulcer and it hadn't improved, and so he referred Ms. Guyer to Dr. Edward Mopsick, an oral surgeon in Washington, and he did the biopsy that confirmed the cancer. That's the only evidence in the record at all that there was cancer. Judge, let me address that. The core of the plaintiff's case with regard to the biopsy, and you heard it here a moment ago, is if there's no change in two weeks, you have a biopsy, all right? That goes to the core of this contested issue that I told you about earlier as to whether we're looking at one continuous thing in the exact same place or different things that happen at different times in different places. The issue of whether a biopsy should have been ordered by my clients goes to the heart of that issue, which was hotly contested. It was contested factually, it was contested by the experts, and it was within the province of the jury to sort that out, to reach their conclusions, which they did. So that's the other side of that, that the biopsy was not called for based upon the standard of care articulated by the plaintiff, based upon the case that we presented. There were issues of differing testimony. There were certainly credibility issues for the jury to sport out. One expert is saying yea, and the other expert is saying nay. That happens every day. That's what the jury is for, and that's what the jury did here. So with regard to the biopsy, I think our point of view is that one should not invest that much significance to the sequence that happened in the fall of 07 without understanding the case that was presented, the evidence presented to the jury that would support the proposition that at those earlier way stations along the timeline, there were good explanations why there was not reason to do a biopsy. There were good reasons why Drs. Togner and Kelly did what they did, and I'll let counsel for Dr. Chin speak on his behalf, but I think that's true for Dr. Chin as well. These were presented to the jury, and the jury had to make the decision, and appropriately so. So that's my answer to the observation that Your Honor has made. Anything further I can address? Thank you, counsel. Thank you very much. Ms. Noonan. Good morning again, Your Honors. Patricia Noonan on behalf of Dr. Daniel Chin. First of all, these are recording devices. They're not microphones. No, you don't want to record it. It won't amplify it. Because you're splitting this argument, tell us exactly who you're speaking on behalf of. Your Honor, I represent Dr. Daniel Chin and his dental practice. Proceed, please. Your Honor, there's been a lot of discussion so far. I want to address some of the specific questions first. Regarding the issue of the admission of the testimony of the other medical providers, the Illinois case law is clear on evidentiary issues that each party is entitled to present evidence, which tends to prove its theory of the case or show conduct that is inconsistent with the opponent's theory. That's the Dayan and Spencer cases we've cited. The defense theory was that Ms. Geyer's tumor was a fast-growing tumor and not present during the dates of defendant's treatment. Plaintiff presented the case that Ms. Geyer had persistent pain throughout and the tumor was present at each visit. In response to Justice Pierce's comments regarding standard of care, this was an issue of proximate cause. Whether the cancerous lesion was present on each of those dates. The treater's testimony went to a lot of issues, not just the issue of what complaints she made and what she observed. A lot of the testimony specifically involved medical issues that were going on at the same time as Dr. Chin's treatment. You mean medical conditions affecting her other than this? Well, that were also her respiratory conditions that Dr. Chin was evaluating as well, issues of her asthma, having an inhaler. Dr. Chin was evaluating causative effects of those issues in September of 2006. I want to address the comment about whether an orthopedic surgeon looking at someone's knee would be looking at the mouth. These medical providers, in light of all her medical issues, had reason to be evaluating areas of her mouth. There's been no mention of Dr. Jeffrey Gittleman, who was a board certified oral surgeon that was evaluating the very issues of the lichen planus that he saw her in April of 2007. Dr. McNamara was diagnosed thrush in the summer of 2007, consistent with the diagnosis of Dr. Chin. He's an otolaryngologist. He's an ENT. He's not qualified as an expert on this at this point, is he? Your Honor, the issue of whether an expert of the same specialty is qualified goes to a standard of care issue. They weren't called as witnesses on standard of care. They were clearly called to say what their observations were and what complaints were made. That evidence tended to prove whether there was a cancerous lichen on those occasions. These were not doctors that were totally unrelated to the areas of the mouth. They all testified that they did look in her mouth. The internist was evaluating upper respiratory systems. And some said they used a tumor depressor to examine the patient, which hid the tumor. Your Honor, counsel at trial cross-examined these doctors in detail. Brought all this information out that you're bringing out here before the jury. That all went to the weight of the evidence. To say that the doctors were not entitled to present all the information that was going on with this Ms. Geyer during this period is to not allow them to present their defense to the jury. As this debate continued and people were dithering about it, and trying to explain this to the jury, it was that they couldn't come to a conclusion. That's in this case the constant in it is trying to find the real, what really was going on on her tongue and what it was. And it wasn't found until the very end. Because it was the defense theory that it was a fast-growing tumor, and it was supported by a well-qualified expert in oral cancers, and physical evidence regarding the size of the tumor when it was diagnosed,  it wasn't really diagnosed until the very end, until they did a biopsy. Because everybody was arguing that it may not be cancer at all. And it was supported by the defense medical experts that more than likely than not, that that tumor did not develop until months before it was diagnosed, and it was not present during defendant's treatment. That was a valid medical theory supported by a well-qualified expert in oral cancer. Defendants were entitled at trial to present that theory to the jury. If that were so, they wouldn't do the standard which was applied throughout the case, and that is the physician views the tongue and says come back in two weeks. This was a constantly progressing disease. And you say it was progressing fast. And if that's so, there should have been an intervention much earlier in an attempt to find out exactly what it was, and that would have been through the biopsy. With all due respect, Your Honor, I think the evidence that was presented of the medical conditions at each of the visits do not support plaintiff's conclusionary that there was one persistent lesion throughout. Our brief set forth the information that was available, the explanatory information of what was present on that date, and there were different locations. It couldn't happen that way, not the way they did it, because it was an F1, an F2, or an F3, and by the time she got to the F3, she lost two-thirds of her tongue to the surgery. If they had gotten it in the beginning, according to this record, this could have been done with a small procedure. Your Honor, plaintiffs, I raised, we raised in our brief the proximate cause issue that the medical evidence from plaintiff's expert, Dr. Coach, was not even sufficient to show the type of, he did not have sufficient evidentiary information available to even provide a valid opinion of what the medical outcome would have been. So what does that do to a jury that's trying to figure out something this complex? A jury of laypeople, and they're trying to put all this together to make sense. How could they? And then you add in the, I guess I'd call them, well, I won't call them kibitzers, but the people from Washington, D.C. So now you've got nine instead of six involved. Instead of three, rather. And so I, these frankly don't fit together. Otherwise, the case never would have unfolded the way it is in this record. Your Honor, with the time I have, I'd like to direct my arguments to the issue that plaintiff was required to prove that Dr. Chin violated the standard of care at the two visits based on the information that was presented to him. That is what was required under the law, is that they had to prove that the information available to him at the visits in September 2006 and April 2007, he violated the standard of care based on his diagnosis and his decisions relating to the biopsies. That includes then the decision to take the biopsy from the cheek rather than the tongue. Your Honor, plaintiff's argument that there was one persistent lesion as he's presented on appeal to this court asks this court to ignore all the evidence of the complex medical history that Ms. Geyer had. It also asks the court just to disregard the standard of care testimony of what goes into the doctor's differential diagnosis and what goes into the matters that evolve to the treatment plan. I believe you made a comment earlier that Dr. Chin made a note that it might be cancer and that raised a red flag. What Dr. Chin did as a proper analysis in a medical situation is he had the patient get differential diagnosis based on the clinical presentment to him. The top of his list was lichen planus and other fungus type related. At the bottom of the list based on the presentation was oral cancer. That was not a red flag to him. When he took the biopsy of the cheek, it was returned as benign. Both Dr. Chin's expert background and Dr. Ghali clearly testified that that was within the standard of care based on the presentation he had before him to biopsy the cheek and he was not required to biopsy both. Appellant misstates the record. His appellate brief completely misstates and distorts the evidence of what Dr. Chin's expert testified to. He never agreed with or disagreed with Dr. Chin's testimony that this was not a substantially similar lesion that required a biopsy of only the cheek. If you review the record citations, clearly his testimony was consistent with Dr. Chin. They were substantially similar lesions. They were not separate lesions. His testimony was it's impossible that the cheek is not connected to the tongue and that was a technical, it's not physically possible to be continuous. Clearly his testimony was the lesion which involved an abnormality that covered most of the tongue, the cheek and the floor of the mouth was substantially similar and a biopsy was only required of the cheek. Dr. Chin next sees Ms. Guyer in April of 2007. At that point, based on all the information he has, he is confident at that point in time that she had thrush. It was on the vestibule of the floor of her mouth and also in the area of the tongue. The other treaters that diagnosed similar conditions support that. Dr. Krell, plaintiff's expert against Dr. Chin, just simply discounted all the information regarding her significant medical background and just concluded she never had any of these conditions. The only thing she had was this persistent cancerous tumor from May of 2006. Well, lengthen cannot be treated evidently, but thrush is treatable. Why didn't they just go ahead and start the treatment on the thrush? Are you speaking at the time of... From the time when it became part of the record where it was noticed and where it was used as the definition of what the problem was that Ms. Guyer had as opposed to the definition of possible cancer of the tongue. In September of 2006, it was diagnosed as lichenoid features. At that point, Dr. Krell, plaintiff's expert, said at that point in time, there's no treatment for the actual lichenoid features. When Dr. Chin diagnosed the thrush in April of 2007, he does give topical treatment for the Kenalog to treat that. And he refers her also back to her, I believe the ENT or whoever was treating the esophageal issues. She had other issues going on at the time. So he did begin the treatment plan for the thrush in April of 2007. But this kept proceeding until what, August of 2007? I don't remember when the exact date of the biopsy was. Dr. O'Brien? We'll take a look at that. I'm sorry, go ahead. Your Honors, I've kind of addressed the issues of the standard of care and the issues of the other treaters. And I believe under the law, the purpose of having the requirement of expert testimony on the standard of care issues, I believe is highlighted by the very arguments presented in Appellant's brief. They request this Court to look at the case in the vacuum and to conclude that there was one persistent lesion. Medical and dental treatment is not a precise science. Doctors are always presented with complex symptoms and medical issues. By narrowly framing the issue on this appeal, Appellant is asking this Court to look at the case in the vacuum and to, one, ignore all the evidence regarding the complex medical history and symptomology that plaintiffs have had at the visits with Dr. Chin, and two, the expert evidence regarding the thought processes that went into Dr. Chin's differential diagnosis and his treatment. The jury weighed all the evidence, assessed the credibility of all the witnesses. Your Honors, the verdict was not against the manifest weight of the evidence. Thank you for your consideration. Mr. Havinson? I want to just address a few things, and if there's any other further questions for me, obviously I'd be happy to answer those. First about the suggestion that we're making an assumption that this lesion was persistent. I mentioned earlier today, it's in our briefs, Dr. Hurst, who was the expert for Dr. Taugner and Kelly, testified to that jury that this lesion was persistent at the second visit, which is the August 30, 2006 visit. That is what triggered Dr. Taugner to send her to the oral surgeon. The only reason to send her to an oral surgeon would be to get a biopsy. And the fact that Dr. Chin did a biopsy, although unfortunately the wrong part at that time, tells you that he believed there was a persistent lesion, because that's what all the evidence was. And the only persistent lesion on September 15 when he did the biopsy was the tongue, because it was uncontradicted. There was nothing on the cheek until she showed up to Dr. Chin. The other thing I want to address is I heard a lot about this, well, it just goes to the weight. So I guess the argument that we're now hearing is you can throw anything you want at a jury and let them sort it out. And I mentioned this earlier, I want to say it again, the weight, if there was any at all, to the treaters and what they were doing with that evidence in order to put that in front of the jury is zero or minuscule. And the unfair prejudice, your honors addressed that in some of the questions I think you asked opposing counsel. That was incredibly prejudicial to the plaintiff under the facts of this case. And these were not fact witnesses. They gave opinions of diagnoses, medical diagnoses, and they gave opinions about whether a biopsy was necessary. Those are not fact witnesses. They amounted to what Justice Pierce referred to as three plus six, nine people had to get it wrong, and they made that statement in their closing argument. That's what they were trying to get the jury to believe, that the plaintiff can't win unless all nine of these people are wrong. Wrong about what? Wrong about the diagnosis. Wrong about whether to do a biopsy. The closing argument that they refer to that they claim I invited is not at all what they suggested. I, in closing argument, mentioned that Dr. McNamara, who Dr. Chin's expert, Dr. Ghali, said, had this right under his nose in July and August and missed it. That was what I was commenting on. They want to talk about these treaters, these guys because they didn't see it, it wasn't there. That's what that comment was, and that was valid. They brought that up. Their own expert said that, that by then it was under their nose. It was under the nose in August. In August 27 and August 30, Dr. Chin saw this patient. There was no biopsy done. Dr. Taubner didn't even suspect cancer at that point, and the biopsy doesn't get done until early October after Dr. Klein, the internist, finally it's so obvious to him that he says we've got to do something about it after it persists in his eyes for two weeks. So the closing argument was not invited by me at all. It was invited by the facts of the case, and they went far beyond what I would have invited in any way. And the key to this case, it goes back to the medicine here, the dental or the oral surgery aspects of the case. Thrush, lichen planus, lichenoid features, all those things are benign. Cancer is deadly, and the only way you know whether it's cancer or say, I know it's cancer, but it's not cancer, is to do a biopsy, and that's why the standard of care is you give it two weeks. And if there's something still there, it doesn't matter if it changed color. In fact, if it changed color, it's worse. If it changed to anything that changed in it, the fact that it's persistent means it's still there. It could look different ways at different times. Persistence is the presence of it, not what it looks like. Something that's there at least two weeks, standard of care is the biopsy. That's all they had to do here. And the evidence is clear this was there the whole time. They thought it was a bunch of other stuff that's benign, but they were wrong. And we believe that the evidence clearly, that this verdict was against the manifest way of the evidence based upon all the evidence in this case, and a major factor in this jury concluding what they did after hearing this case was that they were misled by the presentation of these six treaters from Washington who should not have been allowed to testify to what they testified to under the facts of this case. That's all I have to say. If anybody has any other questions, I'd be happy to address them. Thank you. Counsel, thank you for your presentations and your briefs. This case will be taken under advisement. Court is adjourned.